OPINION
{¶ 1} Defendant-appellant, James C. Bliss, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, following a jury trial, of one count of murder with a firearm specification. Because the weight of the evidence supports the conviction, and because defendant received the effective assistance of counsel, we affirm.
 {¶ 2} On the evening of July 20, 2003, defendant fatally shot Shawnee Norton ("Shawnee") following an altercation outside an apartment building on East 9th Avenue in Columbus, Ohio. Following an indictment, a jury trial commenced on January 20, 2004. Several witnesses testified on behalf of the state as to the events surrounding the shooting. Several Columbus law enforcement officers also testified for the state. Defendant did not testify on his own behalf and did not present any witnesses. Pertinent testimony provided by the state's witnesses will be detailed in the discussion of the assignments of error.
 {¶ 3} The jury found defendant guilty of murder with a firearm specification. The trial court imposed a prison sentence of 15 years to life with an additional three-year prison term for the firearm specification. Defendant filed a delayed appeal of the trial court's judgment finding him guilty of murder, asserting the following two assignments of error:
[I]. The trial court erred when it entered judgment against the defendant when the verdict was not supported by the manifest weight of the evidence.
[II]. Trial counsel rendered ineffective assistance in not requesting that the court give the jury a voluntary manslaughter instruction and in not fully developing evidence to support tht [sic] charge, resulting in the denial of the right to a fair trial and the right to effective assistance of counsel under the Sizth [sic] and Fourteenth Amendments to the United States Constitution as well as Article On [sic], Section Ten of the Ohio Coonstitution [sic].
 {¶ 4} In his first assignment of error, defendant contends his murder conviction is against the manifest weight of the evidence.[1] In Statev. Thompkins (1997), 78 Ohio St.3d 380, the Supreme Court of Ohio set forth the following standard for a court addressing a criminal conviction based upon a claim that the verdict is contrary to the manifest weight of the evidence:
* * * "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
Id. at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 5} When reviewing a conviction on manifest weight grounds, an appellate court does not construe the evidence most strongly in favor of the state. Rather, a reviewing court must engage in a "`limited weighing of the evidence to determine whether there is sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt.'" State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 19, quoting State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Thompkins, supra, at 387. An appellate court will not reverse a jury verdict on manifest weight grounds unless all three appellate judges concur. Thompkins, supra, at paragraph four of the syllabus.
 {¶ 6} Moreover, "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. "The trier of fact has the benefit of seeing and hearing the witnesses testify and is in the best position to determine the facts of the case." State v. Monroe
(Sept. 21, 2000), Franklin App. No 99AP-1464, citing In re Good (1997),118 Ohio App.3d 371, 377.
 {¶ 7} Testimony presented by the state is as follows. Debra Norton ("Norton"), Shawnee's mother, testified that she was visiting Shawnee and his girlfriend, Shekaria Blanks ("Blanks"), at their apartment on East 9th Avenue on July 20, 2003. Shawnee told Norton he had recently been confronted by a woman and a young man who accused him of spreading a rumor that the woman was a "snitch." (Tr. Vol. I, 93.) Shortly thereafter, Norton noticed two African-American men she did not recognize outside the apartment building. According to Norton, the older of the two men (later identified as defendant) was wearing a white T-shirt, black shorts, and had an afro; the younger man (later identified as defendant's brother, Willie Bliss ("Willie")) was wearing a black basketball jersey with a number on it; his hair was braided. The two men were soon joined by two African-American women, one of whom was later identified as defendant's mother, Dorothy Edwards ("Edwards"). The group walked toward Shawnee and Norton; Edwards pointed her finger and cursed at Shawnee. A verbal argument ensued between the two factions, during which defendant accused Shawnee of earlier "disrespecting" Edwards. (Tr. Vol. I, 95.) Shawnee denied the allegation, and Norton assumed the argument was over. However, Willie then moved aggressively toward Shawnee. Shawnee remarked to Willie that it looked like Willie still wanted to fight. Willie said he did want to fight; he then removed the basketball jersey he was wearing and approached Shawnee with his fists clenched. Shawnee initially backed away; however, the two eventually traded unsuccessful swings.
 {¶ 8} By this time, several people, including Blanks, had gathered to watch the fight. Eventually, Edwards entered the fray. Norton grabbed her, and the two women fell to the ground. Thereafter, defendant joined Willie in fighting Shawnee. At one point, Shawnee hit defendant and knocked him to the ground. When defendant stood up, he shot Shawnee twice from close range; he and Willie then ran away. Shawnee ran a few steps and then collapsed. Medics arrived and transported Shawnee to the hospital; however, he did not survive. Approximately one week after the shooting, Norton identified Willie and Edwards from a photo array; she could not, however, identify defendant as the shooter.
 {¶ 9} On cross-examination, Norton admitted that in an interview with a detective shortly after the shooting, she stated she was not looking in Shawnee's direction when the shots were fired because she was on the ground fighting with Edwards; accordingly, she did not "focus on the gun." (Tr. Vol. I, 117.) She further acknowledged telling the detective that when she heard the gunshots, she "turned around" to see her son running down the street. (Tr. Vol. I, 118.) However, she explained that "there wasn't nothing going right in my mind" and that she was "upset" and "panicked" during the interview because she had just been informed of Shawnee's death. Id. Norton insisted that although she was still on the ground fighting with Edwards at the time Shawnee was shot, she was able to see defendant shoot her son.
 {¶ 10} Blanks also testified for the prosecution. She averred that prior to the night of the shooting, she had twice seen defendant and Willie talking to Shawnee. On the evening of July 20, 2003, she saw defendant, Willie and Edwards approach the apartment building and argue with Norton and Shawnee. Willie was wearing a basketball jersey over another shirt; defendant's hair was "all over his head" as if he had just undone his braids. (Tr. Vol. I, 135.) According to Blanks, the argument concerned a derogatory remark Shawnee had allegedly made about Edwards. Willie eventually removed his jersey and began fighting with Shawnee. Defendant soon joined the fight. A short time later, Blanks observed defendant "go down a little bit" and reach for what she assumed was a gun. (Tr. Vol. I, 139.) She ran to her car to get out of the way and to retrieve her cell phone. She heard one gunshot and turned toward Shawnee. She then saw defendant point the gun at Shawnee and fire a second shot. Blanks called 911 from both her cell phone and her home phone. A few days after the shooting, Blanks identified defendant from a photo array as the person who shot Shawnee. At trial, she identified defendant as the shooter.
 {¶ 11} The prosecution played the tape of Blanks' 911 calls for the jury. In the first call, Blanks reported that Shawnee had been shot twice in the stomach. She initially identified the shooter as a "short black girl." (Tr. Vol. I, 153.) When the 911 dispatcher requested a description, Blanks responded: "Short black girl and a white dude and a black — two black dudes. I'm nervous." Id. Later in the call she stated: "I don't know which one shot." Id. When the 911 dispatcher again requested a description of the suspects, she replied: "I don't have a description at all on the suspects." Id. In the second 911 call, Blanks stated that she "saw the fight [and] he's white." (Tr. Vol. 1, 155.) She then described the suspects as a black man wearing a black jersey, a black man with an afro wearing a white shirt, and the man's mother. (Vol. I, 155.)
 {¶ 12} Blanks confirmed that the voice on the 911 tape was hers. When questioned about her reference to a white male, she explained that she was a "nervous wreck" and was "panicked" because she had never before seen anyone get shot, her five-year old son was outside at the time of the shooting, and the medics had not yet arrived to assist Shawnee. (Tr. Vol. I, 156.) She was adamant that no white male was involved in the altercation.
 {¶ 13} On cross-examination, Blanks admitted that she told the 911 dispatcher she did not know who shot Shawnee; however, she reiterated that she did so only because the scene was chaotic and she was a "nervous wreck." (Tr. Vol. I, 164-166.) When questioned by defense counsel about a statement she allegedly made to a detective at the hospital, to wit: "I heard — seen the second gunshot. All three of them were standing together, so it could have been * * * I couldn't even say which one for sure. * * * I couldn't even see nothing." She stated she was unsure whether she had made such a statement. (Vol. I, 168.) She further indicated that even if she had made the statement, it was only because "she was not in her right mind," as she had moments earlier learned that Shawnee had not survived his injuries. Id. When questioned about how she knew that Shawnee had been shot twice in the stomach when she had already admitted she had not seen the first shot, she denied that someone told her what to tell the 911 dispatcher. She further dismissed defense counsel's suggestion that she had discussed the case with Norton or anyone else prior to trial. She insisted that her in-court identification of defendant as the shooter was accurate.
 {¶ 14} Shevaughn Harris, a neighbor, testified that on July 20, 2003, she heard arguing outside her apartment. She looked out the window and saw Shawnee and Norton arguing with two African-American men and one African-American woman she did not recognize. One of the men had an afro and was wearing a white T-shirt and jeans; the other had a black "doo rag" on his head and was wearing a basketball jersey with a white T-shirt under it. (Tr. Vol. I, 179.) A fistfight erupted between Shawnee and the two men; the man with the doo rag removed his jersey. Harris saw the man with the afro turn toward Shawnee with his arm extended; she then heard two gunshots. The two men with whom Shawnee was fighting then ran away. On cross-examination, Harris admitted that she never saw a gun and that she only saw the man with the afro extend his arm toward Shawnee. She further admitted that at the time the shots were fired, she saw only a side view of the two men. On re-direct examination, she reiterated that it was the man with the afro that extended his arm immediately prior to the time the shots were fired.
 {¶ 15} Margaret Lyons, a Norton family friend who lived nearby, testified that on July 20, 2003, she observed Shawnee talking with two African-American men she did not recognize. One of the men was thin, wore braids in his hair and was dressed in a basketball jersey. The other man was heavier and wore a white T-shirt; his hair was "wild" as if it had recently been taken out of braids. (Tr. Vol 1,198.) The thin man repeatedly circled Shawnee, asking him why he had declined a previous opportunity to fight him; he then removed his jersey and began fighting with Shawnee. After the other man entered the fight, Shawnee hit him; the man then reached into the waistband of his pants. Lyons ran behind a car; she then heard two gunshots. A few days after the shooting, Lyons identified Willie from a photo array as the thin man with the braids.
 {¶ 16} On cross-examination, Lyons admitted that she knew the Norton family and Blanks well and that she continued to live in the same neighborhood after the shooting; however, she denied discussing the case with either Norton or Blanks. When presented with the summary of her interview with a detective, she denied stating that both of the men involved in the disturbance were wearing white T-shirts.
 {¶ 17} Angela Hughes, defendant's girlfriend on July 20, 2003, also testified for the prosecution. She admitted that she was initially charged with obstructing justice, a third degree felony, as a result of the July 20, 2003, incident; however, in exchange for her cooperation with the prosecution in its case against defendant, the charge was reduced to a misdemeanor count of obstructing justice. She further testified that a charge of perjury from an unrelated incident remained pending against her.
 {¶ 18} As to the events of July 20, 2003, she testified that she and defendant went to visit Edwards at her home on East 8th Avenue. When they arrived they saw Edwards and Willie in an alley arguing with Shawnee. Willie removed the basketball jersey he was wearing in preparation for a fistfight with Shawnee. A short time later, defendant entered the skirmish while Norton fought with Edwards. A crowd gathered to watch the fight, which lasted a few minutes. Gunshots were fired, and the crowd quickly disbursed. Angela ran to Edwards' home after the shooting; defendant arrived there shortly thereafter. The couple later met up with Edwards and Willie. After receiving a tip that the police were looking for them, the four went to Youngstown, where they were arrested two days later. Hughes testified that she never saw defendant or Willie with a gun and did not see who fired the weapon.
 {¶ 19} On cross-examination, Hughes testified that Willie was wearing a white tank top under his basketball jersey; defendant was wearing a red and gray jersey during the entire incident. She also testified that police identification photographs of defendant and Willie indicate they are both six feet tall.
 {¶ 20} Columbus Police Officer James Morrow also testified for the prosecution. According to Morrow, he and his partner were on patrol in the area near the shooting and were the first officers to arrive at the scene. Morrow observed an African-American male with a gunshot wound to his left side lying in the street. Several people were in the area near the victim. The officers secured the scene and began interviewing possible witnesses. Most of those interviewed were uncooperative, offering only brief descriptions of possible suspects. Harris was the only witness that identified herself. She did not furnish a written statement; however, she did provide a verbal account of the incident.
 {¶ 21} Columbus Police Detective Tim O'Donnell testified that he interviewed Blanks at the hospital. O'Donnell described Blanks as being "upset," but coherent and cooperative. (Tr. Vol. I, 35.) O'Donnell further averred that Blanks was unable to provide names of possible suspects; however, she was able to recount the events surrounding the shooting as well as provide descriptions of the suspects.
 {¶ 22} Columbus Police Detective Dana Farbacher, the lead detective on the case, testified that a few days after the shooting, Blanks and Norton identified Willie from a photo array as the individual involved in the fight with Shawnee. Blanks also identified defendant as the person who shot Shawnee; however, Norton was unable to identify defendant as the shooter. Farbacher further testified that Norton also identified Edwards as the person with whom she fought. Lyons also identified Willie from a photo array; however, she could not identify defendant. Based on these identifications, Farbacher filed arrest warrants for defendant, Willie, and Edwards. He later filed an arrest warrant for Hughes after determining that she was with defendant's group on the night of the shooting.
 {¶ 23} On cross-examination, defense counsel played an excerpt of the tape of O'Donnell's interview with Blanks for the jury. On the tape, Blanks stated that while Shawnee was fighting with the first man, the second man joined the fight. She further stated that the first man, who was wearing a white shirt, pulled out a gun and shot Shawnee. She later stated that all three of the men were standing together and that she could not be certain who was the shooter. Although Farbacher acknowledged that eyewitness identifications are easily tainted by outside influences and pressures, he admitted that he did not question either Blanks or Norton as to whether any outside influences had affected their identifications of defendant.
 {¶ 24} On re-direct examination, Farbacher testified that he did not believe that Blanks' and Norton's identifications of defendant as the shooter were tainted by outside influences. The prosecution then played the entire tape of O'Donnell's interview with Blanks for the jury. In addition to the statements made in the excerpted portion of the tape provided by the defense, Blanks also stated that Shawnee first fought with an African-American man of average height and medium build who wore a white T-shirt and his hair in an afro. The fight concerned statements Shawnee allegedly made about the man's mother. Shortly thereafter, the first man's brother joined the fight. Blanks described the second man as younger, shorter, and thinner than the first man; he wore a basketball jersey. She further stated that she saw the first man, the one in the white T-shirt, pull out a gun and shoot Shawnee twice.
 {¶ 25} Defendant argues that biased, inconsistent and conflicting testimony presented by the state's witnesses rendered the jury's verdict unreliable. We disagree.
 {¶ 26} Defendant first contends that Hughes' testimony was not credible because of the plea bargain she reached with the state in exchange for her testimony. This argument is without merit. The details of Hughes' plea agreement were revealed to the jury for its consideration. Through her testimony, the jury was made aware that her potential penalty under the plea agreement was significantly less than it would otherwise have been. The jury was, therefore, free to assess Hughes' credibility in light of the plea agreement. As noted previously, the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact. DeHass, supra.
 {¶ 27} Furthermore, Hughes' testimony was not particularly damaging to defendant's case. Although Hughes confirmed that both defendant and Willie fought with Shawnee and that gunshots were fired during the fight, she also testified that she never saw defendant with a gun and did not see who fired the weapon. She further testified that Willie wore a white tank top under the basketball jersey he removed during the fight and that defendant wore a red and gray jersey during the entire incident. Hughes' testimony actually lends credence to the defense theory that the witnesses who identified the shooter as the one wearing a white T-shirt were actually identifying Willie and not defendant.
 {¶ 28} Moreover, Hughes' testimony was not the only testimony upon which the state relied to demonstrate that defendant was guilty of the charged offense. Norton and Blanks both testified that they observed defendant fire a gun at Shawnee. Blanks identified defendant as the shooter both from a photo array and in court. Harris testified that she saw defendant extend his arm toward Shawnee moments before gunshots were fired. Lyons testified that she saw defendant reach into the waistband of his pants just before she heard two gunshots.
 {¶ 29} However, defendant also contends that the testimony of Norton, Blanks, Harris and Lyons was untrustworthy. Defendant claims that these witnesses conspired to align their testimony against him to avenge Shawnee's death. Defendant's contention is purely speculative. Defendant cites no evidence in support of this theory other than that establishing that all four women were connected in some way either to Shawnee or to each other. Further, both Blanks and Lyons expressly denied that they had discussed the case with any of the other witnesses prior to trial and Farbacher testified that he did not believe that identifications of defendant as the shooter provided by Blanks and Norton were tainted by outside influences.
 {¶ 30} Moreover, defendant's conspiracy theory fails because the testimony provided by the four witnesses does not align in every respect. Only Norton and Blanks testified that they actually observed defendant fire a gun. Harris and Lyons both admitted that they did not see a gun. Had the four witnesses "changed their testimony to match one another" as argued by defendant, they likely would have made certain that each of them would assert that they observed defendant fire a gun at Shawnee. As noted previously, Harris testified only that she saw defendant extend his arm in Shawnee's direction, and Lyons testified that she saw defendant reach into the waistband of his pants. Further, defendant offers no suggestion as to why the witnesses chose to conspire against defendant rather than against Willie. Both men fought with Shawnee, and no evidence suggests that the witnesses harbored a grudge against defendant or otherwise sought revenge against him for some past transgression. Indeed, Norton, Harris and Lyons all testified that they did not know defendant.
 {¶ 31} Defendant further claims that Blanks' trial testimony was unreliable because it was inconsistent with statements she made to the police immediately after the shooting. Initially, we note that a defendant is not entitled to reversal of a conviction on manifest weight of the evidence grounds merely because inconsistent testimony was heard at trial. Raver, supra, at ¶ 21. "`While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render a conviction against the manifest weight * * * of the evidence.'" Id., quoting State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236. A jury, as finder of fact, is free to believe all, part, or none of the testimony of the witnesses who appear before it. State v. Wiley, Franklin App. No. 03AP-340, 2004-Ohio-1008, at ¶ 48.
 {¶ 32} Defendant contends that inconsistencies between Blanks' in-court identification of defendant as the shooter and statements she made to the 911 dispatcher and to O'Donnell at the hospital, rendered her testimony unreliable. Admittedly, Blanks' identification of the assailant in the aftermath of the shooting was rather disjointed. In her first 911 call, she initially identified the shooter as a short black girl. She then described the suspect as a short black girl, a white male and two black males, but averred she did not know which one of them was the shooter. In the second 911 call, she mentioned a white male as well as two African-American males. In the interview with O'Donnell, she stated that she could not state with certainty which of the men fighting with Shawnee shot him. These discrepancies do not render Blanks' testimony incredible nor do they render the verdict against the manifest weight of the evidence. Blanks explained that she could not precisely identify the shooter immediately after the shooting because she was distressed by the shooting of her boyfriend and the chaos surrounding the scene. Given the circumstances here, evidence regarding Blanks' arguably inconsistent identification of defendant as the shooter was the jury's to resolve. "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."State v. Coleman (Nov. 21, 2000), Franklin App. No. 99AP-1387, citingManson v. Brathwaite (1977), 432 U.S. 98, 116, 97 S.Ct. 2243.
 {¶ 33} In short, the jury had the opportunity to hear the testimony of all the witnesses who appeared before it and evaluate their credibility. An appellate court may not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is manifestly clear that the fact finder lost its way. State v. Green, Franklin App. No. 03AP-813, 2004-Ohio-3697, at ¶ 25. After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice in arriving at its verdict. To the contrary, we conclude that the weight of the evidence supported the conviction. Accordingly, the first assignment of error is not well-taken.
 {¶ 34} Defendant's second assignment of error contends that he was denied a fair trial due to ineffective assistance of counsel. In particular, defendant asserts his trial counsel was ineffective in failing to request an instruction on voluntary manslaughter and in failing to develop evidence which would have supported such an instruction.
 {¶ 35} In Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, the United States Supreme Court adopted a two-part test for determining whether counsel's performance was so defective as to require reversal of a conviction. Id. at 687. Initially, the defendant must demonstrate that counsel's performance was deficient. Id. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment to the United States Constitution. Id. The defendant must then show that counsel's deficient performance prejudiced his defense. Id. This requires demonstrating that, but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694.
 {¶ 36} "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. In Ohio, a properly licensed attorney is presumed competent and the burden of proving ineffectiveness is on the defendant. State v. Smith (1985), 17 Ohio St.3d 98, 100. Counsel's actions which "might be considered sound trial strategy," are presumed effective. Strickland, supra, at 689. "Prejudice" exists only when counsel's performance renders the result of the trial unreliable or the proceeding unfair. Id. The accused must demonstrate that there exists a reasonable probability that a different verdict would have been returned but for counsel's deficiencies. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
 {¶ 37} R.C. 2903.03(A) defines voluntary manslaughter as knowingly causing the death of another while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force. Voluntary manslaughter is an inferior degree of murder. State v. Rhodes (1992), 63 Ohio St.3d 613, 617. An inferior-degree offense is one in which the elements of the offense are contained within the higher-degree offense but additional mitigating elements are present in the inferior-degree offense. See State v.Cornett (1992), 82 Ohio App.3d 624, 631.
 {¶ 38} A jury must find a defendant guilty of voluntary manslaughter rather than murder if the prosecution proves, beyond a reasonable doubt, that a defendant knowingly caused the victim's death, and if a defendant establishes by a preponderance of the evidence the existence of the mitigating circumstances. Rhodes, supra. Accordingly, a defendant has the burden of producing evidence relating to the existence of the mitigating circumstances in order for the jury to consider voluntary manslaughter as an inferior-degree offense of murder. In addition to the burden of production, a defendant also has the burden of persuasion, which means a defendant must establish the existence of the mitigating circumstances. Id.
 {¶ 39} Before instructing the jury on voluntary manslaughter, the trial court must apply both an objective and subjective standard. Statev. Shane (1992), 63 Ohio St.3d 630, 634. Under the objective test, the trial court must first determine whether the alleged provocation was reasonably sufficient to have brought on sudden passion or a sudden fit of rage. Id. That is, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635. If the objective test is met, the inquiry then shifts to whether the defendant in the case at bar was actually under the influence of sudden passion or fit of rage. Id. at 634. At this point, the defendant's emotional and mental state and the conditions and circumstances that surrounded him at the time of the killing are considered. Id. If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial court must, as a matter of law, refuse to instruct the jury on voluntary manslaughter. Id. "In that event, the objective portion of the consideration is not met and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted." Id.
 {¶ 40} Contrary to defendant's assertion, we find the evidence insufficient as a matter of law to establish provocation reasonably sufficient to incite the use of deadly force. Defendant's contention that Shawnee provoked defendant's use of deadly force by spreading rumors about defendant's mother is untenable. In most situations, words alone will not constitute reasonably sufficient provocation to incite the use of deadly force. Id. at paragraph two of the syllabus. Furthermore, the evidence establishes that defendant and his group initiated the verbal argument with Shawnee which led to the fistfight that culminated in the shooting of Shawnee. By all accounts, Shawnee merely responded to the provocation occasioned by defendant and his allies. Thus, defendant has failed to meet even the objective standard in order to demonstrate reasonably sufficient provocation.
 {¶ 41} Moreover, assuming arguendo that this court could find that defendant was reasonably provoked by Shawnee's actions, the evidence offered at trial does not support a finding that defendant acted under the influence of a sudden passion or fit of rage. Defendant did not testify at trial, and none of the witnesses testified as to defendant's state of mind at the time of the shooting. Although the testimony of Norton and Lyons established that Shawnee knocked defendant to the ground during the fight, such evidence is insufficient to establish that defendant acted under the influence of sudden passion or rage. Although such action might have rendered defendant fearful of Shawnee, "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." State v. Mack
(1998), 82 Ohio St.3d 198, 201. Under the facts of this case, defense counsel's failure to request a jury instruction on voluntary manslaughter was not ineffective assistance of counsel.
 {¶ 42} Similarly, we find untenable defendant's claim that trial counsel was ineffective in failing to develop evidence which would have supported such an instruction. More specifically, defendant contends that trial counsel should have developed additional evidence in support of the theory that Shawnee's alleged gossip about defendant's mother being a "snitch" would have such dire consequences for defendant and his family in a neighborhood permeated by frequent robberies and shootings that defendant was clearly provoked into using deadly force against Shawnee. Resolving this issue in defendant's favor would be purely speculative. Nothing in the record indicates what type of testimony defense counsel could have elicited in advancing this theory. Indeed, counsel may have determined that the witness testimony defendant claims should have been developed would not support a voluntary manslaughter instruction. Further, to the extent defendant contends that such a theory could have been developed through his own testimony, we note that counsel may have had sound reasons for keeping defendant from testifying on his own behalf.
 {¶ 43} Here, defense counsel's strategy was to claim that the evidence was insufficient to prove that defendant shot Shawnee. Counsel attempted to advance this theory by exploiting inaccuracies and inconsistencies in the witnesses' identifications of defendant as the shooter. Indeed, counsel's cross-examination of the state's witnesses theorized that it was Willie, and not defendant, who shot Shawnee. Under this theory, counsel might have reasonably concluded that a request for an instruction on voluntary manslaughter might be antithetical to this defense, as it would have been inconsistent for counsel to assert both a defense that defendant caused Shawnee's death in a sudden fit of passion or rage and a defense that defendant did not cause Shawnee's death at all. See Statev. Dean (Mar. 11, 1993), Franklin App. No. 92AP-1011; State v. Wymer,
Lucas App. No. L-0-3-1125, 2005-Ohio-1775, at ¶ 31.
 {¶ 44} The Ohio Supreme Court has recognized that if counsel, for strategic reasons, decides not to pursue every possible trial strategy, defendant is not denied effective assistance of counsel. State v. Brown
(1988), 38 Ohio St.3d 305, 319. When there is no demonstration that counsel failed to research the facts or the law or that counsel was ignorant of a particular strategy, a reviewing court defers to counsel's judgment in the matter. State v. Clayton (1980), 62 Ohio St.2d 45, 49.
 {¶ 45} Here, trial counsel's failure to pursue a theory of voluntary manslaughter fell reasonably within the realm of trial strategy. Had the jury believed counsel's assertion that inconsistencies and inaccuracies in the witnesses' testimony rendered their identifications of him as the shooter unreliable, it would have been required to completely acquit the defendant on the sole charge instructed, i.e., murder. Counsel's theory of the case was developed effectively through cross-examination and was argued fervently during closing argument. Under the circumstances here, it was reasonable trial strategy to argue that the witnesses misidentified defendant as the assailant rather than to argue that defendant was provoked by Shawnee into shooting him. Defense counsel did not render ineffective assistance of counsel by failing to pursue a strategy that was not supported by the evidence and would conflict with the defense theory presented at trial that the witnesses misidentified defendant as the shooter. On the whole, counsel's strategy, although unsuccessful, was a legitimate approach to defendant's defense. The record demonstrates that defense counsel represented defendant in a competent manner. Accordingly, the second assignment of error is not well-taken.
 {¶ 46} For the foregoing reasons, defendant's two assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Bryant and Sadler, JJ., concur.
Deshler, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] R.C. 2903.02(A) defines murder, in pertinent part, as "purposely caus[ing] the death of another." While defendant argues that his conviction is against the manifest weight of the evidence, he does not argue that his conviction is not supported by sufficient evidence. Thus, defendant apparently concedes that the state presented sufficient evidence to prove each of the material elements on the charge of murder. See State v. Thompkins (1997), 78 Ohio St.3d 380.