OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Jonathan Johnson, filed March 10, 2008. On July 1, 2007, Johnson was charged by way of complaint in Dayton Municipal Court with one count of aggravated robbery (deadly weapon), in violation of R.C. 2911.01(A)(1), a felony of the first degree. Following a preliminary hearing, the municipal court determined, "there is *Page 2 
probable cause to believe that the crime charged in the complaint was committed, and Defendant committed said crime." The municipal court remanded Johnson to the custody of the Montgomery County Sheriff s Department to await grand jury action.
 {¶ 2} On July 23, 2007, a Montgomery County Grand Jury indicted Johnson on one count of aggravated robbery (deadly weapon), with a firearm specification. On July 26, 2007, Johnson pled not guilty. On August 14, 2007, Johnson filed a "Motion to Suppress Statements and Memorandum in Support of Defendant's Position." Following a hearing on August 15, 2007, the trial court overruled Johnson's Motion. On October 31, 2007, Johnson filed a "Motion and Memorandum to Suppress Identification Testimony," which the trial court also overruled after a November 20, 2007, hearing.
 {¶ 3} Following a trial by jury, Johnson was found guilty as charged on February 5, 2008, and the trial court sentenced Johnson, on February 22, 2008, to a definite term of imprisonment of three years, along with an additional term of three years on the firearm specification, to be served consecutively and prior to the definite term of imprisonment, for a total term of six years. The trial court also ordered Johnson to pay restitution to Stephen A. Johnson, for economic loss, in the amount of $280.00, and to American Family Insurance Company, for economic loss, in the amount of $2,021.00. The court also notified Johnson that he will be subject to three years of post-release control.
 {¶ 4} The events giving rise to this matter began on June 30, 2007, at approximately 3:00 a.m., while Officer Jennifer Stack of the Dayton Police Department was on routine patrol. After Stack turned from Delphos Avenue onto West Third Street, heading eastward, she observed Stephen Johnson (hereinafter "Stephen") flagging her down in the area of 2936 West Third Street, outside of *Page 3 
the Bruster Hut. Stephen told Stack that he had been robbed by two black males dressed all in black, and the men had then run up Shoop Avenue. Stack advised Stephen to wait at the Bruster Hut, and she drove northbound on Shoop. Just north of Second Street, on Shoop, Stack observed "a black male dressed all in black running northbound," who was later determined to be Jonathan Johnson (hereinafter "Johnson"). Stack pursued Johnson. While Johnson was running, he turned his head while under a street light, and Stack was able to view his face.
 {¶ 5} Stack advised other officers in the area via dispatch that she observed the suspect running "around West Second and Shoop area," and Officer Jason Tipton proceeded to that location. When Tipton arrived in the area, he heard dogs barking, and he followed the sound, believing it might be indicative of Johnson's presence. Minutes later, "another officer advised over the radio that he saw a black male in all dark clothing running northbound on the west side of Brooklyn, which was a block away" from Tipton's location. Tipton drove to the Brooklyn area and exited his cruiser in an alley.
 {¶ 6} Tipton soon observed a black male (Johnson) walking eastbound across the alley. According to Tipton, the black male fit the description and "was walking real slow as if trying not to cause attention and he was looking around as he was walking across the alley." Tipton followed Johnson, finding him in a vacant lot hiding beneath a bush. Several other officers had responded by this time, and all of them drew their weapons in the vacant lot. Tipton advised Johnson to show the officers his hands, and Johnson rolled sideways out from under the bush and put his hands in the air. Johnson was wearing a tee shirt and a pair of long shorts, past the knee. Stack observed Tipton take Johnson into custody, and she recognized Johnson as the man who was running from her. Johnson stated, "I ain't done nothing. I just finished smoking dope." Tipton placed Johnson in handcuffs, *Page 4 
patting him down for weapons. In the process, several coins and a set of keys fell out of Johnson's pocket. Tipton also recovered approximately $20.00, a package of cigars, a lighter, and another set of keys from Johnson.
 {¶ 7} While Tipton walked Johnson to Officer Eric Kleinhans' nearby cruiser, Johnson made several statements. According to Tipton, Johnson first indicated, "it was the other two." Then, "he said, `Fuck it, I'll do my time, give me 120 months, I'm a beast." Tipton testified that he was not talking to Johnson at all or asking him any questions while Johnson was talking. Tipton did not read Johnson his Miranda rights.
 {¶ 8} Johnson was placed in the cruiser in handcuffs, and Kleinhans transported Johnson down the alley to Tipton's cruiser, while Tipton walked. Officer Kleinhans testified that in his cruiser on the way down the alley, Johnson "[p]retty much the whole way on that little jaunt, that block long jaunt, he kept insisting that he get his property back, kept asking, am I going to get my property back, am I going to get * * * my money back * * *." Kleinhans responded, "you'll get your cigars and your money and your two sets of keys and none of us need any of your property. And with that, he immediately came back with, `I only have one set of keys.'" Kleinhans testified that he did not Mirandize or threaten Johnson. The officers then removed Johnson from Kleinhans' cruiser, placing him in Tipton's. Tipton testified that he did not threaten Johnson or make any promises to him to obtain any statements.
 {¶ 9} Stack testified at the hearing on the second motion to suppress that she returned to the Bruster Hut after Johnson was secured, and she learned that Stephen had gone home. Stack then proceeded to his residence. About 30 minutes after her arrival, Tipton arrived at Stephen's home with Johnson in the back of his cruiser. Stack approached the cruiser, leaving Stephen in front of his *Page 5 
residence. Tipton gave Stack a set of keys, Stack brought them to Stephen, and Stephen identified the keys as his. Stack did not indicate how she came to be in possession of the keys. Stack testified that there was no radio traffic over her shoulder radio regarding Johnson while she spoke to Stephen. Stack asked Stephen if he would be able to identify the persons who robbed him, and he indicated that he would be able to do so. Stack did not indicate to Stephen that anyone had been detained in the course of their investigation of the robbery. Stack told Stephen that she wanted him to look at someone in the cruiser, and Stephen stated he was willing to do so. Stack did not indicate to Stephen that the suspect in the cruiser had committed the robbery. According to Stack, as "we walked up along the driver's side, he looked at the rear, at the Defendant, saw him, he said, that's the guy, he's the one with the gun." Stack testified that an evidence crew later came to Stephen's residence and photographed the keys.
 {¶ 10} At trial, Stephen testified that he had been at a club with a friend for a while earlier on the night of the robbery. Stephen returned home, and then he decided to go to the Bruster Hut to get something to eat. According to Stephen, while he was inside, waiting for his food, Johnson and another man approached him. Johnson shoved a gun into Stephen's right side, ordering Stephen to give Johnson "his stuff." Stephen testified that the man wore "a dark pullover sweater * * * with a hood," gym shoes and Levi-type pants. Stephen described the gun as follows: "It's a gun that has a clip and it has a sight of a little red mark at the front and in the back. Then that's to sight in on a person." Stephen put his hands in the air, and Johnson went through his pockets, taking his cell phone, wallet and keys. Johnson passed the items to the other man, who put them in his pocket. Stephen testified that Johnson also "snatched" two chains from Stephen's neck, and he took Stephen's rings from his fingers. Stephen stated that the other man did not speak to him at all. *Page 6 
According to Stephen, "I kind of urinated because of the drama. I felt violated. It disturbed me to this day having a gun put on you."
 {¶ 11} Stephen testified that the men then left the Bruster Hut and proceeded across West Third Street. Stephen followed the men outside to ascertain their direction, noticing Stack in her cruiser coming down the street. Stephen yelled to her that he had been robbed, and pointed at the fleeing men.
 {¶ 12} Stephen stated that Stack asked him to remain at the Bruster Hut, but that he went home "to compose" himself. When later presented with Johnson, Stephen testified that he told Stack that he recognized Johnson as the man "with the gun" who robbed him. Stephen testified that the next day he walked through the area where Johnson ran, and he retrieved his empty wallet, along with some papers and photographs therefrom that were scattered about, but not his jewelry or his cell phone.
 {¶ 13} At trial, on direct, Stephen identified three photographs of keys he observed the police crew take after the robbery as "[m]y personal keys." On cross-examination, Stephen had difficulty identifying the individual keys in the photographs, noting "[i]t's not a clear picture." On re-direct, Stephen testified that he was "[m]ost definitely" sure the keys were his. He further affirmed that he responded to police questions about the keys when they were returned to him, and that he knew where each of the keys belonged. According to Stephen, in the two months since the robbery, his keys had changed somewhat.
 {¶ 14} Johnson asserts three assignments of error. His first assignment of error is as follows:
 {¶ 15} "THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION TESTIMONY." *Page 7 
 {¶ 16} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." State v. Purser, Greene App. No. 2006 CA 14,2007-Ohio-192, ¶ 11.
 {¶ 17} In overruling Johnson's motion to suppress identification testimony, the trial court adopted Stack's testimony "as the Court's factual conclusions." According to the trial court, it reviewed her testimony and "found that testimony not only at the time that it was given, but when I reviewed it, to be credible and believable testimony." The trial court then concluded that the "show up identification was reliable and admissible."
 {¶ 18} Johnson argues that Stephen's identification of him was "not reliable, and therefore, inadmissible."
 {¶ 19} "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. Neil v. Biggers (1972), 409 U.S. 188, 196-97,93 S.Ct. 375, 34 L.Ed.2d 401. To establish a due process violation, a defendant must prove that the out of court confrontation was `unnecessarily suggestive and conducive to irreparable mistaken identification.' Stovall v. Denno (1967), 388 U.S. 293, 302, *Page 8 87 S.Ct. 1967, 18 L.Ed.2d 1199. However, even where the identification procedure is suggestive, so long as the challenged identification itself is reliable, it is still admissible. State v. Moody (1978),55 Ohio St.2d 64, 377 N.E.2d 1008. See Manson v. Brathwaite (1977), 432 U.S. 98, 114,97 S.Ct. 2243, 53 L.Ed.2d 140, (`reliability is the linchpin in determining the admissibility of identification testimony').
 {¶ 20} "In evaluating reliability of the identification, factors to be considered are: `the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' Biggers, supra at 199;Moody, supra at 67, 377 N.E.2d 1008. Initially, it is worth noting that police use of a show-up, without more, does not violate due process.Biggers, supra at 198. Indeed, this Court has found that `[p]rompt on the scene show ups tend to insure the accuracy of the identification, involve a minimum intrusion and insure the prompt release of persons not identified.' State v. Gilreath (June 19, 1992), Greene App. No. 91-CA-35 at *1.
 {¶ 21} "Undoubtedly, the showing of one suspect to witnesses is suggestive. The central question is whether, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. Neil v. Biggers, supra."State v. Marshall, Montgomery App. No. 19920, 2004-Ohio-778, ¶ 11-13.
 {¶ 22} Stack testified that Stephen told her that two black males dressed all in black robbed him, and Stack then observed "a black male dressed all in black running northbound." Stack testified that about 30-35 minutes elapsed between the time she initially spoke to Stephen outside the Bruster Hut until Tipton arrived (without activating his overhead lights) at *Page 9 
Stephen's residence with Johnson in his cruiser. Stephen told Stack that he would be able to identify the men who robbed him. Upon seeing Johnson, Stephen said, without hesitation, "that's the guy, he's the one with the gun."
 {¶ 23} Under the totality of the circumstances, we agree with the trial court that the identification procedure herein, although suggestive, was reliable such that due process was not violated. Stephen had the opportunity to view Johnson while the robbery took place. The accuracy of Stephen's description of a black man dressed all in black was corroborated by Stack's and another officer's description of a fleeing Johnson. Stephen indicated to Stack that he would be able to identify the men who robbed him. Stack did not represent that Johnson was the individual who had committed the robbery. There was no radio traffic from Stack's shoulder radio relating to Johnson's detention during the identification process. Finally, the robbery occurred less than an hour before the show up, and Stephen's identification of Johnson was quick and certain. Since, under the totality of the circumstances, Johnson has failed to demonstrate that the show up procedure herein was unnecessarily suggestive and unreliable, his first assignment of error is overruled.
 {¶ 24} Johnson's second assignment of error is as follows:
 {¶ 25} "THE JURY'S VERDICT SHOULD BE REVERSED AS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 26} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial *Page 10 
ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v.Dossett, Montgomery App. No. 20997, 2006-Ohio-3367, ¶ 32.
 {¶ 27} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. State v.DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 28} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 29} According to Johnson, the only testimony against him is Stephen's, and Stephen's testimony is inconsistent and not credible. For example, Johnson asserts that the clothing Johnson was wearing at the time of his arrest does not match that described by Stephen. Johnson further asserts there is no evidence that the keys recovered belong to Stephen. Also, Johnson asserts that none of Stephen's other allegedly stolen property was found on or around Johnson when he was detained. Finally, Johnson argues, "the fact that no gun was ever found and that no witnesses were offered to corroborate the victim's story cannot be ignored." *Page 11 
 {¶ 30} First, Stephen's is not the only testimonial evidence offered against Johnson. Stack observed Johnson fleeing from the robbery, and she got a look at Johnson's face. When Tipton removed Johnson from the bush where he was hiding in the vacant lot, Stack testified, "this is the guy that's been running from me."
 {¶ 31} Further, although Stephen described Johnson as wearing a dark pullover and Levi-type slacks, and Johnson was recovered wearing long black shorts and a tee shirt, the jury could have reasonably concluded that Stephen, based on his testimony, was very traumatized and more focused on the weapon being stuck into his side than on the clothing of his assailant. The jury could have also concluded that Johnson discarded the pullover along the way in an effort to distinguish his appearance from that initially observed by Stephen and the other officers. SeeState v. Bliss, Franklin App. No. 04AP-216, 2005-Ohio-3987, at ¶ 32
(inconsistencies in identification testimony do not render convictions against the manifest weight of the evidence.)
 {¶ 32} Also, while Stephen had difficulty identifying the individual keys in the photograph because the picture was unclear, Stephen indicated that he was "[m]ost definitely" certain the keys were his when they were returned to him. Stephen testified that he observed the evidence crew photograph the keys and return them to him. Stephen also testified that he has "changed up a little on my keys" since the incident. Finally, Johnson was found with two sets of keys, and he indicated to Kleinhans in the cruiser that he only had one set of keys.
 {¶ 33} While none of Stephen's other property was found on Johnson or in his vicinity when he was detained, the jury could have reasonably concluded, based upon Stephen's testimony, that the lack of recovered items was due to the fact that Johnson *Page 12 
handed them to the other perpetrator, who placed them in his pocket.
 {¶ 34} Regarding the lack of a weapon, the jury could have reasonably concluded that Johnson abandoned his weapon along the way as he fled the scene.
 {¶ 35} Having reviewed the entire record, weighed all of the evidence and all reasonable inferences, and deferring to the jury's assessment of witness credibility, we cannot determine that the evidence weighs heavily against Johnson's conviction for aggravated robbery such that a new trial is warranted. Johnson's second assignment of error is overruled.
 {¶ 36} Johnson's third assignment of error is as follows:
 {¶ 37} "THE INDICTMENT RETURNED AGAINST THE DEFENDANT WAS DEFECTIVE IN THAT IT OMITTED A NECESSARY ELEMENT FOR THE OFFENSE OF AGGRAVATED ROBBERY."
 {¶ 38} "The Ohio Supreme Court recently issued a decision dealing with the need for a mens rea statement in indictments, and whether error in this regard is structural or simply subject to a plain error analysis. See State v. Colon, 118 Ohio St.3d 26, 28, 2008-Ohio-1624,885 N.E.2d 917. In Colon, the Ohio Supreme Court considered whether an indictment was defective, where the indictment contained the statutory language for robbery under R.C. 2911.02(A)(2), but `omitted a mens rea element for the actus reus element stated in subsection (2): `Inflict, attempt to inflict, or threaten to inflict physical harm on another.' Id. at ¶ 10,885 N.E.2d 917.
 {¶ 39} * *
 {¶ 40} "In Colon, the Ohio Supreme Court * * * concluded that the defect in the indictment was structural, and could be raised for the first time on appeal. The court then *Page 13 
reversed the defendant's conviction, because the State had treated the offense as one of strict liability, rather than as an offense requiring recklessness. Id. at ¶ 28-32, 885 N.E.2d 917.
 {¶ 41} In its syllabus, the court stated that:
 {¶ 42} `When an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment.' Id. at syllabus.
 {¶ 43} "Subsequently, on reconsideration, the Ohio Supreme Court limited the syllabus in Colon to the facts of the case. See State v.Colon, 199 Ohio St.3d 204, 205, 2008-Ohio-3749, 893 N.E.2d 169, at ¶ 8. The court noted that the case involved a unique situation, in which the defective indictment had resulted in multiple violations of the defendant's rights. The court, therefore, concluded that a structural error analysis would not be appropriate in cases where multiple errors are not inextricably linked to the flawed indictment. 2008-Ohio-3749, at ¶ 7, 119 Ohio St.3d 204, 893 N.E.2d 169. Instead, in those situations, a plain-error analysis should be used if a defendant has failed to object to the indictment." State v. Turner, Montgomery App. No. 22777,2008-Ohio-6836, ¶ 33, 38-40.
 {¶ 44} According to Johnson, "[a]t issue in the present action is whether the Supreme Court's holding in Colon applies to a conviction for aggravated robbery under R.C. 2911.01(A)(1)." The State responds that Johnson's conviction is not subject to reversal based upon his indictment because "there is no mens rea element for possession of a deadly weapon, it is strict liability."
 {¶ 45} R.C. 2901.21 provides, *Page 14 
 {¶ 46} "(A) Except as provided in division (B) of this section, a person is not guilty of an offense unless both of the following apply:
 {¶ 47} "(1) The person's liability is based on conduct that includes either a voluntary act, or an omission to perform an act or duty that the person is capable of performing;
 {¶ 48} "(2) The person has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense.
 {¶ 49} "(B) When the section defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense. When the section neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense."
 {¶ 50} Johnson was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides:
 {¶ 51} "(A) No person, in attempting or committing a theft offense, as defined in Section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 52} (1) Have a deadly weapon on or about the offender's person or under the offender;s control and either display the weapon, brandish it, indicate the offender possesses it, or use it."
 {¶ 53} We agree with the State that Johnson's indictment is not defective. "The Ohio Supreme Court has previously found that an (A)(1) aggravated robbery is a strict liability offense. State v. Wharf (1999),86 Ohio St.3d 375, 378, 715 N.E.2d 172." State v. Smith, Montgomery App. Nos. 21463, 22334, 2008-Ohio-6330, ¶ 72. Accordingly, Colon's *Page 15 
holding does not apply to the (A)(1) Aggravated Robbery charge in this case. See, Id. In Smith, we noted, as does the State in its brief, the First District's decision in State v. Lester, Hamilton App. No. C-070383, 2008-Ohio-3570, which applied Colon to the aggravated robbery charge that Johnson faced here. We further noted in Smith, however, "the Court of Appeals for the Tenth District has recently addressed this same issue and concluded that Colon does not apply to R.C. 2911.01(A)(1), because an (A)(1) aggravated robbery is a strict liability offense.State v. Ferguson, 10th Dist. No. 07AP-640,2008-Ohio-3827, at ¶ 37-39; State v. Glover, 10th Dist. No. 07AP-832, 2008-Ohio-4255, at ¶ 34; State v. Hill, 10 Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 35." We agreed with the Tenth District's conclusion and analysis, and we determined, as here, that this case is distinguishable from Colon because Johnson was indicted on a strict liability aggravated robbery charge.
 {¶ 54} Accordingly, Johnson's third assignment of error is overruled, and the judgment of the trial court is affirmed.
GRADY, J. and FROELICH, J., concur *Page 1