The STATE of Ohio, Appellee,

v.

HUMBERTO, Appellant.

[Cite as *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 10AP–527.

Decided June 23, 2011.

---

232

234

Ron O'Brien, Franklin County Prosecuting Attorney, and Seth L. Gilbert, Assistant Prosecuting Attorney, for appellee.

Joseph L. Mas, for appellant.

Per Curiam.

{¶ 1} Defendant-appellant, Javier G. Humberto, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of two counts of murder in violation of R.C. 2903.02, one count of attempted murder in violation of R.C. 2923.02 as it relates to R.C. 2903.02, and one count of felonious assault in violation of R.C. 2903.11, all with firearm specifications pursuant to R.C. 2941.145. Because (1) legally sufficient evidence and the manifest weight of the evidence support defendant's convictions, (2) the trial court did not commit plain error in allowing gang-related testimony into evidence, and (3) the trial court did not err in allowing pretrial identifications of defendant into evidence, we affirm.

I. Facts and Procedural History

{¶ 2} The state indicted defendant on December 29, 2008, on (1) two counts of murder, one for purposely causing the death of Ramon Ramos, and the other for causing the death of Ramon Ramos as a proximate result of committing or attempting to commit felonious assault, (2) one count of attempting to purposely cause the death of Angel Devilbiss, and (3) one count of felonious assault for knowingly causing serious physical harm or attempting to cause physical harm by

means of a deadly weapon to Angel Devilbiss. The charges arose from a shooting incident that occurred on November 15, 2008, at a bar called "El Gato Negro," located in Columbus, Ohio.

{¶ 3} According to the state's evidence, Ramon Ramos, his brother Wilmer Ramos, Wilmer's wife Angel Devilbiss, and the Ramoses' cousin, Wilson Guillen, went to El Gato Negro around 10:30 p.m. to pick up Guillen's brother, who was having problems with some members of a gang known as MS–13. When the group arrived at the bar, they noticed a man they did not know who was staring at them in such a way as to make them uncomfortable. An individual, whose street name was "Momia" and who was known to the Ramos group from the soccer fields, where he had attempted to initiate fights with them, began to joust verbally with Ramon shortly after the Ramos group arrived. Momia suggested that the men take the fight outside, and as Ramon turned to walk outside, another individual from Momia's group hit Ramon over the head with a pool stick. In retaliation, Wilmer picked up one of the pool balls and threw it at Momia and his group. The bouncer from the bar, Edward Pyfrom, intervened and forced everyone outside.

{¶ 4} With Momia behind them, the Ramos group began walking to their cars to leave. When an unidentified man tried to intervene, Momia and his group assaulted the man. At that point, another man came from a car, walked towards the Ramos group, and with arms outstretched shot a gun at them. After firing several shots, the shooter and Momia got into the same car and fled the scene. The man with the gun shot Angel Devilbiss's ring finger, thumb, tailbone, and stomach, as well as Ramon's head, upper abdomen, and hip; Ramon died from the multiple gunshot wounds he sustained. Wilmer and Wilson both testified that the man who had fired the shots was the same individual who was staring at the Ramos group when they first entered the bar.

{¶ 5} Shortly after the shooting, police arrived to collect information from the scene. Pyfrom described the suspect to the police as a five-foot-six-inch Hispanic male weighing between 160 and 185 pounds. Wilson gave one of the officers a baseball hat that he said fell off an individual who was involved with the shooting, and police recovered seven spent shell casings from the scene of the incident. On the day after the shooting, a confidential informant working for police turned in to Detective Sandford of the Columbus Division of Police a firearm that she believed was connected to a homicide. Ballistics testing revealed that the firearm was the same firearm used at the shooting. DNA testing on the baseball hat indicated that defendant had not worn the hat. Through several interviews, detectives identified an individual using the street name "Colima" as the primary suspect in the case; they subsequently discovered that defendant was Colima.

{¶ 6} Defendant presented no evidence in his defense, and the jury returned verdicts finding him guilty of all counts charged in the indictment. The court imposed on defendant a prison term of 15 years to life on the two counts of murder, noting that they merged for purposes of sentencing. The court further imposed a prison term of four years on the attempted-murder and felonious-assault convictions, again merging them. The court ordered the sentences to be served consecutively and further imposed six years' imprisonment on the two separate firearm specifications, for a total sentence of 25 years to life.

## II. Assignments of Error

{¶ 7} Defendant appeals, assigning the following errors:

First Assignment of Error

The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of murder, attempted murder, and felonious assault as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence.

Second Assignment of Error

The trial court erred in permitting the state to introduce improper and prejudicial testimony regarding gang culture, thereby violating appellant's rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 10 and 16 of the Ohio Constitution.

Third Assignment of Error

The trial court erred in holding to reveal [sic] the identity and promises made to any confidential informant and motion to suppress identification testimony and to reveal (1) any identification procedures where photographs of defendant were shown to any witnesses, and (2) procedures for how showups and lineups were conducted of the defendant, and (3) to identify any procedures where witnesses were asked to describe any suspects to the offense.

## III. First Assignment of Error—Sufficiency and Manifest Weight

{¶ 8} Defendant's first assignment of error challenges the sufficiency and manifest weight of the evidence. Defendant contends that the evidence connecting him to the murder "was imprecise, circumstantial, and mainly supported by the unreliable testimony of Edward Pyfrom." Defendant does not dispute that someone fired several shots outside El Gato Negro, seriously injuring Angel Devilbiss and killing Ramon. The issue is the identity of the perpetrator of the offenses.

{¶ 9} Whether evidence is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. Sufficiency is a test of adequacy. Id. The evidence is construed in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; *State v. Conley* (Dec. 16, 1993), 10th Dist. No. 93AP–387, 1993 WL 524917. When reviewing the sufficiency of the evidence, the court does not weigh the credibility of the witnesses. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶ 10} Although no weapon or forensic evidence tied defendant to the shooting, Wilmer, Wilson, and Pyfrom all were present at the scene, saw the shooter, and identified defendant as the shooter. " 'Eyewitness identification testimony is sufficient to support a conviction.' " *State v. Coleman* (Nov. 21, 2000), 10th Dist. No. 99AP–1387, 2000 WL 1724817, quoting *State v. Artis* (May 17, 1994), 10th Dist. No. 93APA11–1547, 1994 WL 194953. Construing the evidence in the light most favorable to the state, sufficient evidence identifies the shooter and supports the jury's verdicts.

{¶ 11} The manifest weight of the evidence is both "quantitatively and qualitatively different" than the sufficiency of the evidence. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. When presented with a manifest-weight argument, we engage in a limited weighing of evidence to determine whether sufficient competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt. *Conley*, supra; *Thompkins* at 387, 678 N.E.2d 541 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony"). In the manifest-weight analysis, the appellate court considers the credibility of the witnesses and determines whether the jury " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP–604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, citing *State v. Antill* (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548.

{¶ 12} In reviewing the "manifest weight of the evidence, this court frequently has held that, even where discrepancies exist, eyewitness identification testimony

alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible." *State v. Jordan*, 10th Dist. No. 04AP–827, 2005-Ohio-3790, 2005 WL 1745319, ¶ 14. Accordingly, the issue under defendant's first assignment of error boils down to whether a reasonable juror could have found the testimony of the eyewitnesses to be credible. In that regard, the state relied on the testimony of three witnesses: Wilmer, Wilson, and Pyfrom.

{¶ 13} Wilmer stated that after the fight between Ramon and Momia spilled out into the parking lot, "someone came out shooting." According to Wilmer, the man came from among the cars, walked toward Wilmer's group, and held the gun with both hands with his arms out straight. Wilmer said that he focused during the shooting "on the guy who was shooting at us," and he "could see well," since "[t]here was overhead light from one of the posts there on the corner and it was near where we were." Wilmer testified that Momia did not commit the shooting, as he was still kicking the man who tried to intervene when the shooting first began.

{¶ 14} Although Wilmer was emotional and refused to speak to police on the night of the incident, he spoke with police the next day and identified a photograph of Momia. In January 2009, Wilmer identified defendant as the shooter from a photo array, writing in Spanish on the front of the photo array that defendant was the man who had been looking at him and his brother "seriously like if he had something to do with us. And in reality, that's when he started shooting on me and my wife." Despite cross-examination suggesting that Wilmer was less than certain of his pick, when the photo array originally was presented to him, Wilmer confirmed at trial that defendant's photo, picked in the array, was a photo of the person who shot his wife and brother. Wilmer identified defendant, sitting in the courtroom, as the same man who shot at his group on November 15, 2008.

{¶ 15} The second of the three pivotal witnesses, Wilson stated that the shooter was inside the bar before the incident, giving him and his cousins bad looks. Wilson testified that as the fight spilled out into the parking lot, the shooter came from the back of a car and walked directly towards his group, holding his arms out straight. Wilson said that although he did not get a "really good" look at the shooter's face, he "saw his face" and identified defendant in the courtroom as the shooter. Defendant notes that Wilson did not identify defendant to police when he spoke with them on the night of the incident; instead he first identified defendant as the shooter in the courtroom. Wilson explained that he felt no need to call police to tell them he could identify the shooter, because he saw defendant's picture in the newspaper and concluded that the police already had him in jail.

{¶ 16} Pyfrom, the third eyewitness and the bouncer, testified that the lighting outside El Gato Negro was "real good. It's not that bright, but you can still see everything as it come on. You can see the cars, the tags, the license plates and everything as they park there." Pyfrom stated that he had seen defendant in the bar a couple of times before the incident and specifically recalled kicking defendant out of the bar for violating the dress code approximately one to two weeks prior to the night of the incident. Pyfrom, however, also testified that defendant did not come into the bar on the night of the shooting. Pyfrom was just outside the front entrance of the bar when the shooting occurred, was able to get a clear look at the shooter, and actually saw the fire and smoke come out of the gun. He said that the shooter walked towards the group with his arms straight out, "[s]hooting in to the crowd that was right there." Because Pyfrom told police on the night of the incident that he would be able to identify the suspect, detectives showed Pyfrom a photo array on December 20, 2008. With no difficulty, Pyfrom identified defendant as the shooter both in the photo array and subsequently in the courtroom.

{¶ 17} Defendant contends that a reasonable juror could not believe Pyfrom's testimony because Pyfrom received a sentencing benefit from the state on an unrelated crime. Pyfrom informed the jury that he had two prior felony convictions, was arrested in June 2009 for carrying a concealed weapon, was on probation for a 2005 possession-of-cocaine conviction, and was under indictment for possession of drugs and tampering with evidence. Pyfrom, however, testified that he had no agreement with the state either when he told officers on the night of the incident that he could identify the shooter or when he identified defendant from the photo array a month later.

{¶ 18} Not until January 13, 2010, did Pyfrom enter into a "Defendant's Agreement" with the state, agreeing "to testify truthfully, completely, and accurately" regarding the events of November 15, 2008. In return, Pyfrom received a 12–month sentence on the concealed-weapon charge, and his probation under the 2005 case was terminated for time served. The state reserved the right to reinstate the original charges if Pyfrom testified falsely. Defendant on cross-examination asked Pyfrom if he would have testified had the state not offered him any sentencing benefit, and he responded, "I'd still be here."

{¶ 19} Defendant's cross-examination of the three eyewitnesses may have presented the jury with reasons to question their testimony. The jury, however, had "superior, first-hand perspective in judging the demeanor and credibility of witnesses." *State v. Mickens*, 10th Dist. No. 08AP–626, 2009-Ohio-1973, 2009 WL 1142271, ¶ 30; *DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. It was free to assess their credibility, including Pyfrom's credibility in light of the consideration he received from the state for testifying for the

prosecution, and determine whether their testimony was credible. *State v. Jennings,* 10th Dist. No. 09AP–70, 2009-Ohio-6840, 2009 WL 5062117, ¶ 56, citing *State v. Bliss,* 10th Dist. No. 04AP–216, 2005-Ohio-3987, 2005 WL 1840128, ¶ 26 (concluding that the jury was free to assess the witnesses' credibility where the details of witnesses' plea agreement were revealed); *State v. Covington,* 10th Dist. No. 02AP–245, 2002-Ohio-7037, 2002 WL 31839206, ¶ 28. Nothing in their testimony removed that prerogative from the jury.

{¶ 20} Defendant next contends that the testimony of the three eyewitnesses is not credible because of differences regarding what the shooter wore. Wilson testified that Momia, not the shooter, wore a black hat; Wilmer told police that the shooter had on a black ball cap. Wilmer testified at trial that the shooter wore a white sweatshirt with possibly some black streaks and a hood; Wilson testified that the shooter wore a black and white sweater, like a winter coat, with a hood. Pyfrom testified that the shooter was wearing all black. Sergeant Eggleston testified that although the scene was a well-lit nighttime scene, colors in particular "are hard to distinguish at night."

{¶ 21} The discrepancies in the testimony concerning what the shooter wore render neither the witnesses' testimony incredible nor the verdicts against the manifest weight of the evidence. Three different eyewitnesses identified defendant as the shooter and corroborated the other witnesses' testimony in some aspects. *State v. Monford,* 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 113 (noting that the "eyewitness testimony of the various witnesses corroborated one another" and that the jury could have concluded that "it would be highly unlikely to find that all of the witnesses were not credible"). Any discrepancies were for the jury to resolve in determining which witnesses were credible.

{¶ 22} Defendant may contend that the darkness impaired the ability of the three witnesses to identify him and rendered their testimony unbelievable, but the witnesses and the police officers testified that visibility was good. Moreover, Wilmer and Wilson saw defendant in the bar earlier that evening, and Pyfrom had seen defendant in the bar a couple of times before the incident, both factors that raise the level of reliability. Id. at ¶ 113.

{¶ 23} In the end, the jury found Wilmer, Wilson, and Pyfrom credible despite the discrepancies in their testimony and the benefit Pyfrom received in exchange for his testimony. Given that all three witnesses independently identified defendant as the shooter, a reasonable juror could have found the eyewitnesses' testimony credible. Engaging in the limited weighing of the evidence that we are permitted, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice as to warrant reversal.

{¶ 24} Because sufficient evidence and the manifest weight of the evidence support defendant's convictions, we overrule defendant's first assignment of error.

## IV. Second Assignment of Error—Gang–Related Evidence

■ {¶ 25} Defendant's second assignment of error argues that the gang-related evidence adduced at trial unfairly prejudiced him, allowing the jury to infer guilt from his alleged association with gang members. A trial court has broad discretion concerning the admission of evidence; in the absence of an abuse of discretion that materially prejudices a defendant, a reviewing court generally will not reverse an evidentiary ruling. *State v. Issa* (2001), 93 Ohio St.3d 49, 64, 752 N.E.2d 904.

{¶ 26} Defendant initially questions the trial court's allowing Detective Sandford to testify as an expert regarding gang-related activity. Defendant contends that even if Sandford was properly qualified to testify as an expert witness, the trial court abdicated its role as the "gatekeeper" of evidence when it allowed Detective Sandford to testify regarding MS–13 without first applying the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Defendant further alleges that the trial court erred by allowing portions of Detective Sandford's testimony into evidence, as they were irrelevant and prejudicial.

{¶ 27} A witness may testify as an expert when (1) the testimony relates to matters beyond the knowledge laypersons hold, (2) he or she possesses specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony, and (3) the testimony is based on reliable information. Evid.R. 702(A). As to whether the trial court erred in permitting Sandford to so testify, defendant's argument is problematic for two reasons: defendant failed to timely object and *Daubert* does not apply here.

■ {¶ 28} Although defendant filed a pretrial motion in limine "to prevent any reference whatsoever to MS–13," the trial court denied the motion. Because defendant failed to object during trial to the testimony that he contends should have been precluded under the motion in limine, he forfeited all but plain error. *State v. Maurer* (1984), 15 Ohio St.3d 239, 259, 473 N.E.2d 768 (noting that "[f]ailure to object to evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made for a preliminary motion *in limine*"); *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 115, citing Crim.R. 52(B); *State v. Hartman* (2001), 93 Ohio St.3d 274, 286, 754 N.E.2d 1150 (stating that defense "counsel never objected or challenged his qualifications to testify" and thus "waived all but plain error").

{¶ 29} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial: (1) there must be an error, i.e., a deviation from a legal rule, (2) the error must be plain, so that it constitutes an obvious defect in the trial proceedings, and (3) the error must have affected substantial rights such that the trial court's error must have affected the outcome of the trial. *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. The decision to correct a plain error is discretionary and should be made " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " Id., quoting *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 30} Moreover, defendant's contention regarding *Daubert* is misplaced. In *Daubert*, the United States Supreme Court held that under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id., 509 U.S. at 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. To that end, the court announced a nonexhaustive list of factors the trial court may consider to determine the reliability of an expert's testimony, including whether the theory or technique was tested and subject to peer review, the known or potential rate of error, and whether the theory or technique is generally accepted within the scientific community. Id. at 593–595, 113 S.Ct. 2786, 125 L.Ed.2d 469. The same court later recognized that although the trial judge's gatekeeping obligation applies to all expert testimony, the court should consider the *Daubert* factors only to the extent relevant to a particular expert's expertise. *Kumho Tire Co., Ltd. v. Carmichael* (1999), 526 U.S. 137, 147–149, 119 S.Ct. 1167, 143 L.Ed.2d 238.

{¶ 31} The Supreme Court of Ohio refused to apply the *Daubert* factors to gang-related testimony. *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 119, citing *United States v. Hankey* (C.A.9, 2000), 203 F.3d 1160, 1169 (noting that the Ninth Circuit Court of Appeals "recognized that unlike scientific testimony, expert testimony about gangs depends heavily on the expert's knowledge and experience rather than on the expert's methodology and theory"). In addressing Drummond's contentions about expert testimony on gangs, the court noted that the detective had been a member of the Youngstown Police Department's gang unit for several years and had gained knowledge and experience "through investigating gang activities in the Youngstown area." Id. at ¶ 116. The detective thus showed that "he possessed specialized knowledge about gang symbols, cultures, and traditions beyond that of the trier of fact." Id. The court determined that the trial court did not commit plain error in permitting the detective to testify as an expert.

{¶ 32} Similarly here, Detective Sandford testified he had been a member of the gang unit within the Columbus Division of Police Strategic Response Bureau since 1996, minus a four-year break in which he worked in the bureau as a liaison between the narcotics bureau and the gang unit. Sandford stated that he had received basic gang instruction in the police academy and encountered many gang members in his first eight years as a patrol officer on the near-east side of Columbus. Sandford said that since joining the gang unit in 1996, he has received specific gang training through attending numerous conferences "both locally and nationwide * * * where there [was] further instruction on local gangs, on regional gangs, and on national gangs and what the recent trends are."

{¶ 33} Sandford further stated that he specializes in Latino gang activity in Columbus and teaches other law-enforcement officers about Latino gangs in Columbus and central Ohio. According to Sandford, he has specifically investigated MS–13, also known as La Mara Salvatrucha, and explained its identifiers, such as tattoos, clothing, colors, and signs that indicate membership in MS–13. Sandford stated that he had documented the first MS–13 member in Columbus in 1998 and since then has documented over 50 MS–13 members in the city.

{¶ 34} The testimony demonstrated that Sandford possessed specialized knowledge about MS–13 beyond the trier of fact and was qualified to testify as an expert about MS–13 and gang-related matters. *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 116. The trial court did not commit plain error in allowing Sandford to testify as an expert.

{¶ 35} Defendant lastly contends that the gang testimony was irrelevant, prejudicial, and inflammatory. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "In general, a trial court has discretion to determine whether evidence is relevant, and whether relevant evidence should be excluded." *State v. Peterson*, 10th Dist. No. 07AP–303, 2008-Ohio-2838, 2008 WL 2390781, ¶ 36, citing *State v. Johnson*, 9th Dist. No. 22688, 2006-Ohio-1313, 2006 WL 709044, ¶ 23. "Gang affiliation can be relevant in cases in which the interrelationship between people is a central issue." *Drummond* at ¶ 112, citing *United States v. Thomas* (C.A.7, 1996), 86 F.3d 647, 652. Gang evidence also may be relevant when it is necessary to "provide[ ] the jury with crucial background information in considering the evidence." Id.

{¶ 36} In allowing Sandford to testify regarding MS–13, the court stated that MS–13 was "part of the story" in this case. The testimony supports the court's rationale that El Gato Negro was an establishment that MS–13 members frequented. On the night of the incident, the Ramos party went to El Gato Negro to pick up Wilson's brother, who was having problems with MS–13

members. Wilson testified that he felt the situation was an emergency that needed immediate attention because his brother was alone. According to Wilson, Momia, who started the altercation, consistently tried to fight with Wilson and his cousins. Momia and his group would "say that they were the gang and they were the one who has the powers."

{¶ 37} Further evidence surrounding the incident implicated MS–13. The confidential informant, who turned the murder weapon over to Sandford, worked for the police gathering information about MS–13. She lived with several known MS–13 members over the years, and a documented MS–13 member gave the informant the gun and told her to get rid of it.

{¶ 38} Pyfrom's testimony relevant to his identifying defendant also referred to MS–13. According to Pyfrom, he gave police the false name "James Johnson" both on the night of the incident and when he picked defendant out of the photo array because he knew that MS–13 was dangerous and did not want anyone to find him. Pyfrom agreed that "if a member of MS–13 figured out that, you know, [he was] fingering one of their guys, they could retaliate against" him. Sandford testified that after being given defendant's street name, he was able to come up with defendant's actual name by showing photographs of MS–13 contacts and associates to people they interviewed.

{¶ 39} The evidence pertaining to MS–13 thus was relevant to explain the relationships among the parties and to provide necessary background information regarding why the Ramos group went to El Gato Negro, how the police had obtained the murder weapon, why Pyfrom initially used a false name, and how the police came to identify defendant as a suspect.

{¶ 40} Relying on Evid.R. 403(A), defendant nonetheless asserts that the trial court should have anticipated the "provocative nature of the evidence" and excluded the testimony because the unfair prejudice of the gang-related testimony substantially outweighed any relevancy or probative value the testimony may have had. To exclude evidence pursuant to Evid.R. 403(A), the "probative value must be minimal and the prejudice great." *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267.

{¶ 41} Defendant does not challenge Sandford's gang-related testimony as it pertained to how he obtained the murder weapon or his interrogation of defendant, stating that Sandford's "testimony as to those events [was] clearly proper." Defendant instead claims that Sandford's MS–13 testimony went well beyond what was necessary, specifically pointing to a portion of the detective's testimony where he stated that "MS–13 members across the world have been involved in countless homicides and felonious assaults, shooting people. They're known for

their tendency toward violence, using machetes to chop people's hands and fingers and heads off."

{¶ 42} The statement, however, arose out of defendant's cross-examining Sandford. Exploring defendant's theory that an MS–13 member committed the murder but witnesses identified defendant, who allegedly was not an MS–13 member, out of fear of retaliation, defendant asked Sandford if it would be "fair to say that at least in your opinion, Detective, MS–13 is a relatively dangerous gang?" The detective responded "Overall, yes," causing the court to inquire what the detective meant by "overall." Sandford responded with the statement defendant contests. Where defendant created the circumstances causing the statement to which defendant objects, plain error is not evident. See *State v. Bogovich*, 10th Dist. No. 07AP–774, 2008-Ohio-3100, 2008 WL 2514085, ¶ 10 (explaining that invited error precludes a claim of reversible plain error).

{¶ 43} In the final analysis, the MS–13-related testimony was relevant in providing the jury with background information concerning the individuals involved in the case and police methods for solving the murder. As defendant acknowledges, that testimony was properly admitted. Because defendant elicited what arguably was the most prejudicial and inflammatory statement regarding MS–13, the trial court did not commit plain error in allowing the testimony into evidence. Moreover, considering the three separate eyewitnesses who identified defendant as the shooter, we cannot say that the jury's verdict would have been otherwise absent the MS–13-related testimony to which defendant objects.

{¶ 44} Defendant's second assignment of error is overruled.

V. Third Assignment of Error—Pretrial Identifications

{¶ 45} Defendant's third assignment of error challenges the trial court's decision to admit Wilmer's and Pyfrom's pretrial identification of defendant from a photo array. Prior to trial, defendant filed a motion seeking to suppress identification testimony, to reveal the identification procedures used, and to identify the confidential informant. The motion sought to suppress "all identifications," claiming they not only were conducted out of the presence of counsel but were "so suggestive and conducive" as to increase the likelihood of "irreparable mistaken identification as to violate due process." Although the motion appeared to seek to suppress all identifications, at the suppression hearing the prosecution stated that it was its "understanding [that] the only photo array we're dealing with is the one that was shown to Edward Pyfrom." Defendant did not dispute the prosecution's understanding, so the entire suppression hearing centered solely on Pyfrom's identification. Because defendant received pertinent information regarding the confidential informant, it was not an issue in the trial court and is not on appeal.

{¶ 46} "[A]ppellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact." *State v. Vest* (May 29, 2001), 4th Dist. No. 00CA2576, 2001 WL 605217. Thus, an appellate court's standard of review of the trial court's decision granting the motion to suppress is twofold. *State v. Reedy*, 10th Dist. No. 05AP–501, 2006-Ohio-1212, 2006 WL 648861, ¶ 5, citing *State v. Lloyd* (1998), 126 Ohio App.3d 95, 100–101, 709 N.E.2d 913. Because the trial court is in the best position to weigh the credibility of the witnesses, we must uphold the trial court's findings of fact if competent, credible evidence supports them. Id., citing *State v. Klein* (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141. We nonetheless must independently determine, as a matter of law, whether the facts meet the applicable legal standard. Id., citing *State v. Claytor* (1993), 85 Ohio App.3d 623, 627, 620 N.E.2d 906.

{¶ 47} A defendant's right to due process prohibits the use of identification procedures that are so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *Neil v. Biggers* (1972), 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401. "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140. A trial court considering whether to admit identification evidence must utilize a two-step analysis. Initially, the court must consider whether the procedure was impermissibly suggestive. Secondly, the court must consider whether, despite the procedure's suggestiveness, the identification was reliable. *State v. Sharp*, 10th Dist. No. 09AP–408, 2009-Ohio-6847, 2009 WL 5062338, ¶ 14.

{¶ 48} When assessing the reliability of a pretrial identification, the court must consider the totality of the circumstances, including the following factors: the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his or her prior description of the criminal, the level of certainty demonstrated at the identification, and the time between the crime and the identification. *Biggers*, 409 U.S. at 199, 93 S.Ct. 375, 34 L.Ed.2d 401. Defendant carries the burden of proving "both [that] an identification procedure was impermissibly suggestive and the identification was unreliable." *Sharp* at ¶ 14.

{¶ 49} Within those parameters, defendant particularly takes issue with the method the detective utilized in presenting defendant's photograph to Wilmer and Pyfrom. Detective Wachalec, the lead detective investigating the murder, presented both witnesses with a "simultaneous array" consisting of six photographs, side by side, also known as a "six-pack." Defendant contends that such a procedure is unduly suggestive and that the witnesses should have been shown the photographs one at a time. Defendant further contends that the detective

should have presented the pictures through a "double-blind method," where a neutral officer, who lacks knowledge of the targeted suspect, shows the photo array to the witness. Contrary to defendant's contentions, the "failure to present the photo array using the double-blind and sequential methods does not make the identification procedure unduly suggestive." *Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, at ¶ 51, 54, citing *United States v. Lawrence* (C.A.3, 2003), 349 F.3d 109, 115 (noting that "showing all of the photographs at once using the 'six pack' method could also be a very fair way to proceed").

{¶ 50} In response to *Monford*, defendant cites newly enacted R.C. 2933.83 and urges us to conclude that the six-pack or simultaneous-array method is unduly suggestive. Although R.C. 2933.83, enacted by S.B. 77, instructs law-enforcement agencies to use the double-blind method and shows a clear preference for the sequential method, it became effective July 6, 2010, well after the pretrial identifications and trial here. Accordingly, R.C. 2933.83 does not control the identification procedures that law enforcement utilized in defendant's case.

A.   Pyfrom's identification—photo array

{¶ 51} At the suppression hearing, Wachalec testified that he had used a computer program to generate the lineup, entering criteria "such as facial hair, length of hair, type of hair and other descriptors." The program generated a series of photographs based on the entered criteria. Wachalec then went through the computer-generated photos and picked out ones that "best match[ed] the subject of the photo array." The five selected photos all depict Latino males with short hair and similar facial features who appear to be around the same age. All the photos in the array were in black and white. Wachalec testified that the procedure he used to develop the photo array was a long-standing procedure in the police department.

{¶ 52} When Wachalec showed Pyfrom the array, he informed him that the pictures were in no particular order of importance, the suspect may or may not be included among the photographs, and Pyfrom was not required to select any photograph. The detective further testified that he never told Pyfrom he was to pick defendant. On the night of the incident, Pyfrom told officers that he could identify the shooter, and the detective said that Pyfrom had no problem in choosing defendant out of the photo array.

{¶ 53} Given that evidence, the trial court properly refused to suppress Pyfrom's pretrial identification of defendant, as nothing about the identification procedure was impermissibly suggestive. Accordingly, we need not address whether the identification was unreliable under the totality of the circumstances.

### B. Wilmer's identification—photo array

{¶ 54} The suppression hearing addressed only Pyfrom's pretrial identification of defendant, so we do not address Wilmer's identification in the context of defendant's motion to suppress. Instead, we review defendant's contention that the testimony was improperly admitted into evidence. Defendant did not object to Wilmer's in-court testimony regarding his pretrial identification of defendant, so defendant forfeited all but plain error. *State v. Smith* (1997), 80 Ohio St.3d 89, 115, 684 N.E.2d 668.

{¶ 55} Defendant argues that the pretrial identification procedure regarding the photo array shown to Wilmer was unduly suggestive because Wilmer testified, "Well, to tell you the truth, [the detective] asked me is this the person who shot at you." The transcript, however, is unclear whether Wachalec made the statement to Wilmer before or after Wilmer identified defendant from the array. Aside from the simultaneous-array method and the above statement, defendant does not challenge any other aspect of Wilmer's pretrial identification. Whether or not either element reveals error, any error does not rise to the level of plain error in view of the two other witnesses who testified that defendant was the shooter. Accordingly, we overrule defendant's third assignment of error.

### VI. Disposition

{¶ 56} Having overruled defendant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

Judgment affirmed.

BRYANT, P.J., and SADLER and DORRIAN, JJ., concur.