[Cite as *State v. Johnson*, 2022-Ohio-4641.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                             No. 111473

    v.                                      :

ARNELL JOHNSON,                         :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
             AND REMANDED
**RELEASED AND JOURNALIZED:** December 22, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652785-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and John Hirschauer, Assistant Prosecuting
Attorney, *for appellee.*

Christopher M. Kelley, *for appellant.*

SEAN C. GALLAGHER, A.J.:

{¶ 1}     Defendant-appellant, Arnell Johnson, appeals from the judgment of
conviction and sentence in this case.  Upon review, we affirm in part but reverse in
part and remand to the trial court solely for resentencing, with instructions to merge

Counts 1-4 and to separately merge Counts 5 and 6, which respectively are allied offenses of similar import. The trial court shall vacate the original sentencing entry and resentence Johnson in accordance with this decision.

## I.   Background

{¶ 2}   On September 8, 2020, Johnson and a codefendant, Timothy Evans, were charged under a multicount indictment. The charges stemmed from a shooting incident in which 19-year-old A.T., who was pregnant, was shot multiple times while attempting to leave a crowded city street in her vehicle. She sustained gunshot wounds to her abdomen and legs, and she was taken to the hospital with life-threatening injuries. She survived, but tragically, her fetus did not. She identified Johnson and Evans as the shooters.

{¶ 3}   Testimony at trial revealed that on July 30, 2020, a large crowd was gathered in the area around Crestwood Avenue and East 110th Street in Cleveland, Ohio. A memorial service was being held in the area that day, and there also was a rap-music video being filmed, which involved young males with guns. The police were monitoring social media videos posted from the area and observed multiple people in the videos that were handling firearms while drinking alcohol. When the police first arrived around 8:00 p.m., the crowd had grown to approximately 250 people. The police observed males running in different directions with firearms. The police confiscated several firearms, made a few arrests, and were "concerned for everyone's safety." However, the police were not able to stay in the area long because

they could not get through the crowd, they were getting yelled and screamed at, and they were outmanned and potentially out firepowered.

{¶ 4} A.T. went to the memorial-service event around 4:00 p.m. with a friend to sell merchandise. She described the scene as having a lot of music and noise, a lot of people drinking, and a crowd that became rowdier after dark. After arriving, A.T. witnessed an incident involving Johnson in which other people had to disarm him and tell him to calm down. A.T. testified that sometime after 10:30 p.m., a situation occurred in which a woman was trying to fight her. A.T. got in her car to try to leave and observed someone snatch her brother's gun and then hit him on his head with the gun. She then observed Evans run out in front of her car, jump onto the car, and start shooting at the hood of her car. She testified that she looked to her left and saw Johnson "standing in the field" and "[t]hat's when he pulled a mask over his head and began firing" at the driver's side of her vehicle. She further testified that "nobody was firing from over there until I saw him shooting." The glass broke on the driver's side window, and shots came into her vehicle. A.T. was shot multiple times. She saw there was blood on her, and she could not feel anything. Her brother pulled her out of the vehicle and took her to a hospital. The shooting occurred around 12:55 a.m. A.T. later identified Johnson and Evans in photographs presented to her by the police at the hospital.

{¶ 5} The evidence reflects bullets impacted both the driver's side and the passenger's side of A.T.'s vehicle, with a higher concentration on the driver's side of the vehicle in a downward trajectory. Over 20 shell casings were recovered from the

crime scene, which included 10 mm casings, 9 mm casings, and .40 caliber casings. The cartridge casings came from six different manufacturers. Evans's palm print was found on the front of the car, and police recovered a 10 mm handgun in his vehicle that matched four of the cartridge casings from the crime scene. There was a match to Evans's DNA. No DNA evidence was found that matched Johnson. There was insufficient DNA for some of the recovered evidence. Although there was a preliminary association made for a batch of casings to another male, T.S., he was not identified as being involved in the shooting and was not investigated further.

{¶ 6} GPS data placed Johnson, who was under electronic monitoring, on Crestwood Avenue near East 110th Street within the time frame of the shooting and in the area in which A.T. saw him standing, which also was where a concentration of 9 mm casings were located. The GPS data points were accurate within a range, including points with a range of up to 27 feet, 53 feet, and 79 feet. It appeared from the GPS data that within minutes of the shooting, Johnson traveled by foot down an alley, left in a vehicle, and went to a house a few miles away.

{¶ 7} After being taken to the hospital with life-threatening injuries, A.T. underwent surgery. An exploratory laparotomy revealed two holes in her uterus with a prolapsed umbilical cord, which was transected completely in half. An emergency C-section was performed, and A.T.'s fetus was stillborn. Additional details are included in our evaluation of the assignments of error herein.

{¶ 8} The trial court found Johnson guilty of the following offenses, along with attendant one- and three-year firearm specifications on all counts: (Count 1)

murder involving the unlawful termination of another's pregnancy in violation of R.C. 2903.02(A), as a lesser included offense;[1] (Count 2) aggravated murder of an unborn fetus in violation of R.C. 2903.01(C); (Count 3) murder of an unborn fetus in violation of R.C. 2903.02(B); (Count 4) felonious assault of an unborn fetus in violation of R.C. 2903.11(A)(2); (Count 5) attempted murder of A.T. in violation of R.C. 2923.02/2903.02(A); (Count 6) felonious assault of A.T. in violation of R.C. 2903.11(A)(2); (Count 7) discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3); and (Count 9) having weapons while under disability in violation of R.C. 2923.13(A)(2).

{¶ 9} At sentencing, the trial court imposed an individual sentence on each count; merged Counts 1, 2, and 3; and ordered the three-year firearm specification on Count 5 to run consecutive to the three-year firearm specification on Count 2, which were to be served prior to and consecutive with the underlying sentence; for a total stated prison term of 26 years to life.[2]

{¶ 10} Johnson timely filed this appeal.

---

[1] The trial court found "there was no prior calculation and design" to support a conviction for aggravated murder in violation of R.C. 2903.01(A) but found beyond a reasonable doubt that Johnson committed the lesser included offense of murder in violation of R.C. 2903.02(A).

[2] We note that the sentencing entry differs from the pronounced sentence. Because we are reversing the sentence and remanding for resentencing, the original sentencing entry shall be vacated by the trial court.

## II.    Law and Analysis

{¶ 11}  Johnson raises four assignments of error for our review.  Under his first assignment of error, Johnson claims his convictions were against the manifest weight of the evidence.

{¶ 12}  "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 13}  First, Johnson argues that there was no forensic evidence linking him to any of the recovered evidence, that his convictions were primarily based on the eyewitness testimony of A.T., and that A.T.'s identification of Johnson was unreliable and contradicted by the evidence.  In support of his argument, Johnson references inconsistencies in A.T.'s testimony, refers to the lack of physical evidence to link him to the shooting, questions the police investigation, argues DNA of

another individual was found on some of the shell casings, claims the photo-array identification was tainted, and points to other purported deficiencies in the record.

{¶ 14} Our review of the entire record reflects that the eyewitness testimony and circumstantial evidence weigh strongly against Johnson. Evidence reflected that Evans and Johnson were communicating throughout the day and were hanging out on Crestwood Avenue. They were identified in the video evidence. Evans appeared in a video holding a handgun. A commander with the City of Cleveland Division of Police described the clothing Johnson was wearing in one of the videos, which included Adidas joggers, Nike shoes, and a yellow hoodie, and testified that a person in the exact same clothing appeared in another video with a mask over his face and holding two firearms. A reasonable inference could be made that Johnson was the person wearing the cotton ski mask.

{¶ 15} A.T. testified that she was familiar with who Johnson and Evans were and that she "probably got about three to four seconds of seeing Johnson's face before he pulled the mask down" and began firing. She was "certain" it was Johnson, who was standing approximately 20 feet away from her. Although it was dark, the streetlights were on. She indicated Johnson had on a cotton ski mask, and he had "a hoodie on and some pants." A.T. identified Johnson in the photo array presented to her by the police at the hospital. She also identified Johnson in a video shown at trial.

{¶ 16} Although there were some inconsistencies with A.T.'s former testimony at Evans's trial, including as to whether she looked left before or after the

car window broke and whether she observed Johnson standing in a field or in a driveway when he was shooting, A.T.'s testimony was not incredible. Upon further questioning, A.T. testified that after the shots were fired in front of her, about eight seconds went by, and then she saw "a whole bunch of commotion on the left-hand side" and that was when she saw Johnson pull his mask down and begin firing. She testified that she did not know exactly where he was standing, but that it was somewhere in the area between the driveway and the field. GPS data placed Johnson in the range of the area where A.T. indicated he was standing.

{¶ 17} As this court has recognized, "'[e]ven where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 100126, 2014-Ohio-1624, ¶ 12, quoting *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 52; *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, ¶ 19. Here, in addition to the eyewitness testimony, circumstantial evidence was presented linking Johnson to the crimes. We find this is not the exceptional case in which the evidence weighs heavily against the convictions.

{¶ 18} Next, Johnson challenges his convictions on Counts 2 and 3 for aggravated murder and murder of A.T.'s fetus. Johnson argues that the state failed to establish that the fetus was "viable" so as to establish the criminal offense was committed against a "person." R.C. 2901.01(B)(1)(a)(ii) defines a "person" to include "[a]n unborn human who is viable." Pursuant to R.C. 2901.01(B)(1)(c)(ii),

the term "[v]iable" means "the stage of development of a human fetus at which there is a realistic possibility of maintaining and nourishing of a life outside the womb with or without temporary artificial life-sustaining support."

{¶ 19} In this case, the medical records indicated that the gestational age of the fetus, which weighed approximately 1.2 pounds, was 24 weeks and four days. Dr. Elizabeth Rae Mooney, the medical examiner who examined the fetus, testified that the gestational age was determined by "the actual measurements done on an anatomic scan" and the last menstrual period.[3] Dr. Mooney testified that the fetus weighed 554.8 grams and that the weight "is consistent with a 24 to 25-week gestation." Dr. Mooney testified that from her anatomical and biological examination of the fetus at 24 gestational weeks, the fetus would have been viable if it were born without the defects from the bullets.

{¶ 20} Dr. Andrew Loudon, a trauma and surgical critical care physician for University Hospitals, testified that at 1.2 pounds a fetus would have a difficult chance of survival outside the womb even with life support. He testified that "20 weeks would be unrealistic" and "24 weeks in ideal circumstances, there's a chance, but it's not a good chance." He further explained, "At 24 weeks, what happens developmentally are the lungs start to become mature enough to sustain. So the time period really is right around there where there starts to be a chance."

_____

[3] A.T. had testified that she first discovered she was pregnant in February 2020 and was around six months pregnant at the time of the shooting.

Dr. Loudon was not an expert on the gestational age of a fetus in the mother's womb and did not examine A.T.'s fetus.

{¶ 21} The medical examiner, Dr. Mooney, determined the cause of death was "intrauterine fetal demise due to gunshot wounds of the placenta and fetal lower extremities." Dr. Mooney found from her examination of the fetus that notwithstanding the injuries, overall the baby was a healthy fetus and that "there is evidence of viability or vital reaction," meaning around the injuries "there's bruising of those tissues, meaning there is a heartbeat, pressure within the vessels to give those injuries that vital reaction." Dr. Mooney testified to an amputating gunshot wound to the right lower extremity "with bruising around that on either end of the thigh and the detached leg portion" and to a second gunshot that is "a tangential gunshot wound" that also had an "associated hemorrhage into the surrounding tissues." The fetus also had "lacerations or tearing of the skin" that were "likely from the forces from that gunshot or bullet as it passes through the tissues within the amniotic sac within the placenta * * *."

{¶ 22} Dr. Mooney elaborated on the viability of the fetus as follows:

> Viability in the sense that there was a vital reaction, so the infant was alive. Viability in general means that the infant can sustain life outside the womb at [a] certain gestational age with or without the aid of medical help. So viability — it's viable in the sense that it was alive at the time that it sustained these injuries.

Dr. Mooney clarified that if a fetus is viable, it means the fetus could survive outside the womb at that state in gestation, stating as follows:

Viability is considered to be a certain gestational age. Once the baby is born, they can sustain life outside the womb, with or without the aid of medical help.

Dr. Mooney determined that but for the gunshot wounds to the fetus, A.T.'s fetus was a viable fetus. Dr. Mooney's testimony established the fetus was viable at the time of the shooting.

{¶ 23} Upon our review of the record, we do not find that the trier of fact clearly lost its way in resolving conflicts in the evidence or that any manifest miscarriage of justice occurred. Johnson's convictions were not against the manifest weight of the evidence. The first assignment of error is overruled.

{¶ 24} Under his second assignment of error, Johnson claims that his convictions are not supported by sufficient evidence. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. Circumstantial and direct evidence "possess the same probative value." *Id*. at 272. To survive a sufficiency challenge, the state need only have had sufficient evidence, not the best possible evidence. *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 166. Also, "an evaluation of the credibility of the

testimony * * * is not proper on review of evidentiary sufficiency." *Id.* at ¶ 161, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 200.

{¶ 25} Johnson makes similar arguments as above and claims that there was no DNA or forensic evidence linking him to the crimes, that A.T.'s identification of Johnson as the shooter was flawed, unreliable, and not supported by the record, and that there was insufficient evidence to show the fetus was viable outside the womb at the time of the shooting. Johnson also argues the state failed to produce sufficient evidence that he possessed or otherwise used a firearm as defined under R.C. 2923.11(B)(1). Johnson's arguments are not convincing.

{¶ 26} There is no question that A.T. was shot multiple times and the fetus did not survive. A.T. provided a detailed account of the events surrounding the shooting, which was consistent with the evidence introduced by the state. A.T. was familiar with Johnson, observed him with a firearm during an incident earlier in the day, and identified Johnson as one of the shooters. She saw Johnson standing outside the driver's side of her vehicle, observed his face for three to four seconds, saw him pull a mask over his face, and described his use of a firearm in the shooting. She further indicated that after Johnson began firing, she saw bullets "coming at me." A.T. later identified Johnson from a photo array. The eyewitness identification testimony alone was sufficient to sustain the convictions. *See State v. Smith*, 8th Dist. Cuyahoga No. 107773, 2019-Ohio-2574, ¶ 15; *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, 963 N.E.2d 162, ¶ 10 (10th Dist.). This testimony also

was sufficient to establish that Johnson knowingly possessed or otherwise used a firearm. *See State v. White*, 8th Dist. Cuyahoga No. 90839, 2008-Ohio-6152, ¶ 10.

{¶ 27} Additionally, circumstantial evidence was presented to corroborate the eyewitness identification. Video evidence showed the clothing Johnson was wearing and an individual wearing the same clothing with a mask over his face carrying two firearms. Johnson was communicating with Evans throughout the day, and evidence reflected that Evans was also involved in the shooting. GPS data placed Johnson on Crestwood Avenue at the time of the shooting and in the area in which A.T. testified he was standing. A concentration of 9 mm casings were located in that area. At least four bullet holes were found in the driver side of A.T.'s vehicle. Johnson left the area within minutes of the shooting. "'This court has long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Jones*, 8th Dist. Cuyahoga No. 108894, 2020-Ohio-4915, ¶ 39, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). Further, the lack of DNA or forensic evidence implicating Johnson in the shooting does not preclude a determination that his convictions were supported by sufficient evidence. *See State v. Nicholson*, 8th Dist. Cuyahoga No. 110595, 2022-Ohio-2037, ¶ 153; *Jones* at ¶ 39.

{¶ 28} Evidence also showed that the shooting of A.T. resulted in the death of her unborn fetus. Dr. Mooney, the medical examiner, testified that her examination of the fetus revealed bruising of the tissues showing a vital reaction. She concluded that the fetus, which was at 24 to 25 weeks gestation, was a viable

fetus, meaning the fetus could survive outside the womb. Her testimony was sufficient to demonstrate that the unborn child was viable. *See State v. Cutts*, 5th Dist. Stark No. 2008CA00079, 2009-Ohio-3563, ¶ 177.

{¶ 29} Because the evidence admitted at trial, if believed, would have convinced the average mind that Johnson was guilty beyond a reasonable doubt, we find the evidence was sufficient to support Johnson's convictions and overrule the second assignment of error.

{¶ 30} Under his third assignment of error, Johnson argues that the trial court erred when it overruled his motion to dismiss the indictment on constitutional speedy-trial grounds. Johnson concedes that the court was acting under COVID-19 protocols during the pendency of the matter and does not claim that his statutory right to a speedy trial was violated. He argues that his constitutional right to a speedy trial was violated when considering the overall length of delay, his assertion of the right on multiple occasions, and his disputing whether the numerous continuances were at his request.

{¶ 31} The Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 10, of the Ohio Constitution guarantee a defendant the constitutional right to speedy trial. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 32. To determine whether there has been a denial of a defendant's constitutional right to a speedy trial, the court considers the four factors identified in *Barker v. Wingo*, 407 U.S. 514, 530-533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), including the length of the delay, the reason for the delay, the

defendant's assertion of his speedy trial right, and prejudice to the defendant. *State v. Long*, 163 Ohio St.3d 179, 2020-Ohio-5363, 168 N.E.3d 1163, citing *State v. Hull*, 110 Ohio St.3d 183, 2006-Ohio-4252, 852 N.E.2d 706, ¶ 20. However, no single factor controls the analysis. *Long* at ¶ 14. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker* at 533. A defendant must meet the "threshold requirement" of a "presumptively prejudicial" delay to trigger a *Barker* analysis. *State v. Duncan*, 8th Dist. Cuyahoga No. 97208, 2012-Ohio-3683, ¶ 8. Courts have generally held that a delay approaching one year becomes "presumptively prejudicial." *Long* at ¶ 14, citing *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), fn. 1.

{¶ 32} First, we consider the length of delay. In this case, Johnson was arrested on August 25, 2020, and his trial began on March 28, 2022. The length of delay was over a year and was presumptively prejudicial. Therefore, we will apply a *Barker* analysis and consider the remaining factors.

{¶ 33} Second, we consider the reason for the delay. Different weights should be assigned to different reasons, with a deliberate attempt to delay the trial in order to hamper the defense weighted more heavily against the government than a more neutral reason and with a valid reason serving to justify appropriate delay. *Barker* at 531. In this case, there is no evidence of a deliberate attempt to delay the trial. Rather, the record reflects that the delay was incurred for valid reasons, including the COVID-19 pandemic and because numerous continuances were made

at the request of the defendant or by joint request. Ohio courts have found the COVID-19 pandemic, which was outside the trial court's control, weighs against finding a constitutional violation of the right to a speedy trial. *State v. Mize*, 2022-Ohio-3163, 195 N.E.3d 574, ¶ 65 (2d Dist.) (recognizing speedy-trial claims have been rejected where the delay was caused by the COVID-19 pandemic); *State v. Quinn*, 8th Dist. Cuyahoga No. 110692, 2022-Ohio-2038, ¶ 36 (finding a defendant's constitutional right to a speedy trial was not violated where he requested numerous continuances and the two-year delay was not excessive in light of the COVID-19 pandemic). Although Johnson disputed whether many of the continuances were actually at his request, the journal entries reflect otherwise and it does not appear that Johnson objected to the continuances.

{¶ 34} Third, we consider the defendant's assertion of his speedy trial right. The record reflects that Johnson moved to dismiss the indictment in due course and in a timely fashion.

{¶ 35} Fourth, we consider prejudice to the defendant. In *Long*, the Ohio Supreme Court reiterated that "[t]he prejudice factor in the analysis 'should be assessed in the light of the interests of defendants [that] the speedy trial right was designed to protect[,]'" which include "'(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *Long*, 163 Ohio St.3d 179, 2020-Ohio-5363, 168 N.E.3d 1163, at ¶ 22, quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182, 33 L.Ed.2d 101. The third interest is the greatest concern because it "'skews the

fairness of the entire system.'" *Id.*, quoting *Barker* at 532. Although the time spent in jail awaiting trial has a detrimental impact on the individual, there was little impact on Johnson's ability to prepare his defense. Further, there is no claim that any of Johnson's witnesses died; the record does not reflect any lapses of memory on the part of prosecution witnesses that were significant to the outcome; and Johnson does not articulate any prejudice related to the delay.

{¶ 36} Upon balancing the above factors, we find that Johnson was not deprived of his constitutional right to a speedy trial. His third assignment of error is overruled.

{¶ 37} Under his fourth assignment of error, Johnson argues that the trial court erred by failing to merge as allied offenses of similar import his convictions on Counts 1-4,[4] which related to the unborn fetus. Johnson claims that the conduct for all four counts was the same in that he allegedly fired a gun at A.T. and/or her unborn fetus and that the offenses involved the same animus. Under his fifth assignment of error, Johnson argues that the trial court erred by failing to merge Counts 5 and 6 for attempted murder and felonious assault of A.T. Johnson claims these counts were committed through the same conduct and with the same animus in the alleged shooting at A.T. Johnson recognizes that because Counts 5 and 6 involve a different victim (A.T.) than Counts 1-4 (the unborn fetus), they all do not merge together. Furthermore, Johnson observes that at sentencing, the trial court

---

[4] On Counts 1-4, Johnson was convicted of murder as a lesser included offense, aggravated murder, murder, and felonious assault.

merged Counts 1, 2, and 3 after imposing a separate sentence for each count, rather than having the state elect on which count to proceed to sentencing, and that the sentencing entry orders the sentence on each count to run concurrent to each other.

{¶ 38} The state concedes that the trial court should have merged Counts 1-4 together and should have merged Counts 5 and 6 together based on the Ohio Supreme Court's precedent and applicable case law. We agree. *See State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraphs one to three of the syllabus; R.C. 2941.25. Assignments of error four and five are sustained.

### III. Conclusion

{¶ 39} We affirm in part. We conclude that appellant's convictions are not against the manifest weight of the evidence and are supported by sufficient evidence. We also conclude that there was no constitutional violation of the right to a speedy trial.

{¶ 40} We reverse in part. We conclude that the trial court erred in failing to merge allied offenses of similar import. We reverse the sentence imposed by the trial court and remand solely for resentencing. Upon remand, the trial court shall vacate the original sentencing entry, filed April 4, 2022, and shall resentence Johnson. The trial court is instructed to merge Counts 1-4 together and to separately merge Count 5 and 6 together, which respectively are allied offenses of similar import. At the resentencing hearing, the state must elect which allied offense to pursue, and the trial court must accept the state's choice and merge the respective allied offenses into a single conviction for sentencing. *See State v. Whitfield*, 124

Ohio St.3d 319, 2010-Ohio-2 922 N.E.2d 182, ¶ 20, 24. The trial court shall resentence Johnson in accordance with this decision.

{¶ 41} Judgment affirmed in part and reversed in part; case remanded solely for resentencing with instructions.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, ADMINISTRATIVE JUDGE

MARY EILEEN KILBANE, J., and
EILEEN T. GALLAGHER, J., CONCUR